**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**KAREN L. KENNERLY,**

   **Plaintiff,**

**v.**          **Case No.: 2:15-cv-01540**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

   **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On January 16, 2009 and again on January 28, 2011, Plaintiff Karen L. Kennerly ("Claimant") completed applications for DIB and SSI, alleging a disability onset date of December 4, 2008, (Tr. at 276, 280, 324, 331), due to "epilepsy, depression, anxiety, social anxiety, learning disabilities caused from numerous seizures, memory problems due to numerous seizures."[1] (Tr. at 339, 434). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 14). Claimant then filed a request for an administrative hearing, which was held on July 29, 2013 before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 63-88). By written decision dated August 16, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 14-28). The ALJ's decision became the final decision of the Commissioner on December 9, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11).

---

[1] The Appeals Council remanded the first set of applications on June 21, 2012. (Tr. at 117-19). At the same time, the Appeals Council determined that the second applications were duplicates of the first applications. Accordingly, the claims were associated at that time for issuance of a single decision on all of the applications. (*Id.*).

Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 54 years old at the time of the alleged onset of disability, and just shy of 59 years old on the date of the ALJ's decision. (Tr. at 67). She finished the eleventh grade in school and subsequently obtained a General Equivalency Diploma. (Tr. at 40, 67). Claimant communicates in English and previously worked as a fabric cutter for an upholstery company and as a food preparer at a restaurant. (Tr. at 433, 435). At the time of the ALJ's decision, Claimant was working 20 to 25 hours per week as a cleaner at a Burger King restaurant. (Tr. at 69).

## III.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

3

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§

404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 4, 2008, the alleged disability onset date. (Tr. at 17, Finding No. 2). Although Claimant worked on a part-time basis at Burger King, the ALJ concluded that her wages did not rise to the level of substantial gainful activity. (*Id.*). At the second step of the evaluation, the ALJ found that Claimant

5

had the following severe impairments: "obesity, seizure disorder, chronic cervical and lumbar strain, right knee osteoarthritis, left ankle sprain, cognitive disorder, borderline intellectual functioning, dysthymic disorder, and generalized anxiety disorder." (Tr. at 17-18, Finding No. 3). The ALJ also considered Claimant's other impairments, including gastroesophageal reflux disease and hypertension. (Tr. at 18). However, he found that those impairments were non-severe. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-20, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can frequently stoop, kneel, crouch, and crawl. She can occasionally climb ramps and stairs or balance, but never climb ladders, ropes, or scaffolds. The claimant must avoid all exposure to hazards, such as moving machinery and heights. She is fully capable of learning, remembering, and performing simple, routine and repetitive 1 and 2 step work tasks involving simple instructions, and performed in a low stress environment, which is defined as one in which there is no production pace, no quota requirements, no strict time standards, and "no over the shoulder" supervision. The claimant may have occasional contact with supervisors and coworkers, but should have minimal to no contact with the public.

(Tr. at 20-26, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 26, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 26-28, Finding Nos. 6-10). The ALJ considered that (1) Claimant was born in 1954, and was defined as an individual closely approaching advanced age; (2) she had a limited education and could communicate in English; and (3) transferability of job skills

was not an issue because Claimant's past relevant work was unskilled. (Tr. at 26, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 27-28, Finding No. 10), including laundry worker, dishwasher, and janitor. (Tr. at 27). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 28, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, she claims that the ALJ erred by giving less weight to the opinions of two examining psychologists than he gave to the opinions of two non-examining psychologists. (ECF No. 10 at 11-18). Claimant argues that Social Security regulations and rulings require the ALJ to give more weight to the statements of sources that have examined a claimant than to sources that have not performed an examination. According to Claimant, when an ALJ deviates from this general rule, he must give good reasons for the deviation. Claimant contends that the ALJ failed to provide any logical rationale for the weight he gave to the various medical source opinions.

Second, Claimant asserts that the ALJ's decision is not supported by substantial evidence, because he relied upon testimony by the vocational expert that was erroneous. (ECF No. 10 at 18-20). In particular, Claimant states that the vocational expert identified three jobs that Claimant could perform based upon hypothetical questions posed by the ALJ. The hypothetical questions presumed that Claimant could only perform jobs with a specific vocational preparation ("SVP") of 1 or 2 under the Dictionary of Occupational Titles ("DOT"). However, although the vocational expert testified that all three jobs had a

SVP of 2, the DOT reflects that two of the jobs (laundry worker and janitor) actually have a SVP of 3. Consequently, the vocational expert's testimony was inconsistent with the DOT and Claimant's RFC, and those inconsistencies were neither explained, nor resolved.

In response, the Commissioner asserts that substantial evidence supports the ALJ's RFC finding. (ECF No. 11). Specifically, the Commissioner argues that the ALJ correctly afforded less weight to the opinions of the examining psychologists than those of the non-examining psychologists, because the non-examining sources gave opinions that were more consistent with the rest of the evidence. The Commissioner points out that Claimant was working 20-25 hours per week at Burger King; an activity which belied many of the extreme limitations suggested by the examining psychologists. (*Id.* at 13). Moreover, the Commissioner notes that Claimant had no history of mental health treatment, and she was consistently described as euthymic and oriented, findings that further contradict the opinions of the examining sources. (*Id.* at 14).

With respect to the vocational expert's testimony, the Commissioner contends that Claimant misunderstood the testimony, mistakenly relying on a typographical error. According to the Commissioner, the ALJ clearly meant to find Claimant capable of laundry work, which has a skill level of 2, but the ALJ accidentally transposed two digits and recorded the DOT number for the job of butcher, which has a skill level of 3. The Commissioner argues that when the correct DOT number is used, Claimant is capable of performing the job of laundry worker. Furthermore, the Commissioner emphasizes that the ALJ also found Claimant capable of performing work as a dishwasher, which likewise has a SVP of 2. Thus, even if Claimant is only capable of that one job, the ALJ has established that Claimant is not disabled. (*Id.* at 17).

V.      **Relevant Evidence**

The undersigned has reviewed the evidence in its entirety, including all of the medical evaluations, and summarizes the relevant records below.

### A. Treatment Records

On July 21, 2005, Claimant saw Dr. Carl Yacoub, a neurologist practicing in Delaware. (Tr. at 496-97). Dr. Yacoub noted that he had not seen Claimant since the Spring of 2003, although he would have preferred seeing her sooner. Claimant appeared despondent over recent medical issues faced by her husband and complained of feeling dizzy. Claimant had a history of generalized convulsive disorder, but did not report having any recent seizures. (Tr. at 496). Her general physical examination was normal. Her neurologic examination revealed normal motor tone, strength, and reflexes with an intact sensory system. Claimant had a normal gait and was able to tandem walk without difficulty. Dr. Yacoub indicated that Claimant had been less than compliant, but he was able to say with some degree of confidence that Claimant had not had a seizure in a very long time. He suspected that her dizziness might be related to her anticonvulsant medication. Dr. Yacoub decided to order an EEG, and if Claimant's results were normal, he would consider weaning her from the medication. (*Id.*).

On December 8, 2009, Claimant presented to Dr. Ronald Greer at the River Valley Health and Wellness clinic for follow-up of her epilepsy. (Tr. at 560-61). She reported having her first seizure at age 15 and having her last seizure two and one half years earlier. Prior to her last seizure, she had been seizure-free for an extended period of time despite not taking her anticonvulsant medications. Claimant stated that she did not regularly see a neurologist, indicating that she last saw Dr. Yacoub approximately one year prior. Claimant also complained of left ankle pain and edema, which she associated with a fall

9

she had suffered two weeks earlier. She described twisting her ankle while walking downhill on a gravel driveway, and she now had pain with weight-bearing and ambulation. Claimant was noted to be limping. (Tr. at 560). A general physical examination of Claimant yielded normal findings, and her mental status was documented as alert and oriented times three. Claimant's cranial nerves were intact; she could squat and rise without difficulty; had a normal station and gait; and had equal weight-bearing. (Tr. at 561). Claimant's ankle was swollen and tender, however, and she experienced increased pain with inversion of the foot/ankle. (Tr. at 560). Claimant was diagnosed with seizure disorder, which was stable, and with an ankle sprain. (Tr. at 561).

Claimant returned to Dr. Greer on May 28, 2010, requesting a referral to a neurologist. (Tr. at 562-63). Although she had not had a seizure recently, Claimant complained of feeling depressed and anxious on a daily basis, with confusion and the inability to concentrate. (Tr. at 562). Claimant's neurological evaluation was normal, but Dr. Greer felt that Claimant should see a neurologist and follow-up with Dr. Greer as needed. (Tr. at 563).

On February 28, 2011, Claimant was seen by Dr. Greer for complaints of headache and history of seizure disorder. (Tr. at 605-07). She had not yet seen a neurologist and had not had any testing for seizures during the past three years. Dr. Greer listed her "active problems" as borderline intellectual functioning, cognitive disorder, dysthymic disorder, generalized anxiety disorder, seizure disorder, and hyperlipidemia, although the basis for those disorders is unclear. (Tr. at 605). On examination, Claimant was observed to be well-appearing, alert and oriented, with a euthymic mood and normal affect. (Tr. at 606). Her neurological examination was entirely normal. Dr. Greer assessed Claimant with hyperlipidemia and generalized seizure disorder, convulsive tonic-clonic. (Tr. at

10

607). He referred Claimant to a neurologist and refilled her anticonvulsant medications.

Claimant presented to the office of Dr. Michael Morehead, a neurologist, on March 16, 2011. (Tr. at 640-41). In a follow-up letter to Dr. Greer, Dr. Morehead noted that Claimant had chronic epilepsy beginning at age 15 with generalized tonic clonic seizures. As a teenager, she had a seizure every month, and the seizures were associated with tongue biting and postictal drowsiness. (Tr. at 640). After trying Dilantin and phenobarbital without success, Claimant was placed on Mysoline. Later, Lamictal was added to her medication regimen, and this combination had effectively prevented any generalized convulsive seizure activity for approximately ten years. Nonetheless, Claimant stated that she continued to experience "little" seizures once or twice each month, although Dr. Morehead was not certain of their clinical characteristics. Other than the seizures, Claimant's medical history was "quite benign." (*Id.*). Dr. Morehead noted that Claimant had a history of depression, but had never been treated for that condition. Her brief examination revealed no neurologic abnormalities. Dr. Morehead assessed Claimant with primary generalized epilepsy with convulsive seizures that were well-controlled on current medications. With respect to her small seizures, Dr. Morehead suggested that Claimant increase her dosage of Lamictal. (Tr. at 640-41).

Claimant returned to Dr. Greer's office for follow-up on May 23, 2011. (Tr. at 608-11). She complained of feeling tired and having headaches. Claimant also claimed to suffer from depression and anxiety. (Tr. at 608). Dr. Greer examined Claimant, noting that she was well-appearing, alert, oriented, and in no acute distress. (Tr. at 610). He diagnosed her with hyperlipidemia, generalized convulsive and nonconvulsive seizure disorder, and obstructive sleep apnea. He felt her hyperlipidemia and seizures were controlled and instructed her to follow up with Dr. Morehead. Dr. Greer also ordered a sleep study. (Tr.

at 611).

Claimant saw Dr. Greer again on January 19, 2012 for medication refills. (Tr. at 612-15). Her chronic problems appeared to be controlled, and her examination was normal. On April 30, 2012, Claimant returned to Dr. Greer for follow-up of her hypertension. (Tr. at 616-20). Her mood on this visit was noted to be euthymic, and her affect was normal. (Tr. at 618).

On July 30, 2012, Claimant complained to Dr. Greer that she was feeling "stressed out" and was depressed. (Tr. at 621). However, he observed that Claimant was well-appearing, alert, oriented, and in no acute distress. (Tr. at 623). She was essentially the same at her follow-up visit on October 9, 2012. (Tr. at 625-28). On that visit, Dr. Greer found Claimant's chronic medical problems to be controlled. (Tr. at 628). She remained stable on January 10, 2013, with the exception of having a flare-up of gastroesophageal reflux ("GERD"). (Tr. at 629-34). She had no specific complaints at her routine follow-up on April 11, 2013. (Tr. at 635-39). To the extent that Claimant's GERD was not controlled, Dr. Greer recommended lifestyle modifications such as dietary changes, smoking cessation, and positional measures.(Tr. at 639).

On March 12, 2013, Claimant was seen in the Emergency Department after falling at work. (Tr. at 581-90). She was diagnosed with a contusion of her hip and right shoulder, and was discharged in good condition. (Tr. at 585, 589). Claimant completed a workers' compensation report, indicating that she fell over some dishes on the floor at Burger King while she was cleaning equipment. (Tr. at 590).

## B. Evaluations and Opinions

On March 13, 2009, Claimant was examined by Dr. Stephen Nutter, of Tri-State Occupational Medicine, at the request of the SSA. (Tr. at 504-08). Her chief complaint

was seizures. Claimant reported having her first seizure at age 15 and her last seizure about a year earlier. (Tr. at 504). She described losing consciousness and experiencing an aura when she had a seizure, but she did not lose control of her bowel or bladder. Claimant complained of having chest pain, shortness of breath, and headaches in addition to seizures. On physical examination, Dr. Nutter observed that Claimant walked with a normal gait, appeared stable at station, and comfortable in the sitting and supine positions. (Tr. at 505). Her neurological examination was normal, except Claimant had some difficulty balancing during the tandem walk and had decreased muscle strength in her hips. (Tr. at 507). Dr. Nutter diagnosed Claimant with seizure disorder, chronic cervical and lumbar strain, chest pain, and shortness of breath with an undetermined cause. In summary, he indicated that Claimant's neurological examination was essentially normal with no focal deficits. She had some range of motion abnormalities of the cervical and lumbar spine, but her straight leg-raising test, reflexes, and sensory responses were all normal. He had no explanation for Claimant's complaints of chest pain and shortness of breath, finding no abnormal objective signs of disease. (Tr. at 507-08).

On October 15, 2010, Claimant presented to John R. Atkinson, Jr., M.A., for a psychological examination arranged by her disability attorney. (Tr. at 564-70). Mr. Atkinson started by observing and interviewing Claimant. He noted that she was appropriately dressed and groomed, but appeared uneasy, distractible, and puzzled, with halting speech. (Tr. at 564). He felt that Claimant displayed many signs of a cognitive disorder and neuropathy with thought derailment. She also had problems with attention and focus. Claimant's cooperation was adequate. Her posture was normal, and her gait was slow. Claimant reported having a history of seizures and cognitive deficits, also indicating that she felt "uncomfortable with people." (*Id.*). When asked about her sleep

13

patterns, she reported having some insomnia, as well as having periods of hypersomnia when she would sleep at least twelve hours. (Tr. at 565). She described her energy level as "low." Claimant stated that she had felt depressed and anxious for years, and Mr. Atkinson believed Claimant had social avoidance with social phobic features. (*Id.*). Claimant admitted having problems with her anger, indicating that her husband's laziness made her yell. She described her mood as agitated and worried. Claimant also had obsessive ruminations of her mother, who had died approximately one year earlier.

In regard to her medical history, Claimant discussed the onset of her seizures and the frequency of the seizures during her teenage years. (Tr. at 565-66). Mr. Atkinson observed that Claimant showed hesitancy in processing and responding to questions "with a certain type of nervous movement which would indicate neuropathology." (Tr. at 566). Claimant indicated that since the onset of her seizures, she had become poorly coordinated and had frequently fallen. Claimant stated that she also suffered from psychological distress, but had never received any formal treatment for it. She reported that she had refused medication for depression and anxiety, because of their possible side effects.

Mr. Atkinson reviewed Claimant's school records, which suggested that Claimant's IQ had been tested, and she had an IQ score of 72 at age seventeen. (*Id.*). Mr. Atkinson surmised that this score might demonstrate deterioration of intellectual functioning or cognition secondary to seizure activity. However, he also noted that Claimant missed 25% of her classes beginning in the ninth grade. She denied being in special education classes while at school, but dropped out at age seventeen due to decreases in learning ability and attendance. (Tr. at 567). Claimant provided Mr. Atkinson with her work history, although he documented that she was "reticent" to do so. She did not report having any current

14

interpersonal problems on the job, but stated that she left a job in her early 20's due to "emotional problems and children taken away." (*Id.*).

Mr. Atkinson performed a mental status examination of Claimant. He stated that her social rapport was tentative, and her attitude was vague, uneasy, and distractible. Claimant's speech patterns were coherent, but hesitant, unsure, and marked "by blocking and processing delays." (Tr. at 568). Claimant was oriented to place and person, but only partially oriented to time. She knew the month and year, but not the date. Her mood was slightly anxious and nervous, and her affect was broad. Claimant's thought process associations were relevant, but her stream of thought was slow and marked by episodes of thought derailment. Claimant denied any disorders of thought content, but did show signs of social phobia. Mr. Atkinson assessed Claimant's insight as fair to poor; her judgment was normal; her immediate and remote memory were within normal limits, but her delayed memory was markedly impaired. (*Id.*). Claimant's concentration was moderately impaired, and her attention and abstract reasoning were found to be mildly impaired. Her persistence and pace were normal.

When asked about her social activities, Claimant stated that she attended church every Sunday, although she had no friends. She associated with her family on a daily basis and went out to dinner about once every two weeks. After listening to Claimant, Mr. Atkinson concluded that Claimant's interpersonal relationships were characterized by a passive aggressive hostile dependent orientation and were somewhat stormy, unstable, and histrionic.

Mr. Atkinson administered psychological testing, including the Wechsler Adult Intelligence Scale and the Wide Range Achievement Test. (Tr. at 569). Claimant scored a 79 Verbal IQ, 67 Performance IQ, and 71 Full Scale IQ. Mr. Atkinson felt the scores were

15

valid, because Claimant expended average effort. However, he noted that Claimant's subtest scores were inconsistent, indicating underlying neuropathology. He concluded that Claimant was at an eighth grade literacy level, but, nonetheless, had obtained a GED and took vocational classes in bookkeeping and typing. He assessed her adaptive functioning deficits to be in complex work and academics. The Wide Range Achievement Test scores were consistent with Claimant's IQ testing, reflecting that she read at an 8.3 grade level and performed mathematics at a 5.0 grade level. (*Id.*).

In summary, Mr. Atkinson concluded that Claimant showed residuals of her seizure activity with inconsistent intellectual functioning and "spotty abilities which are better in verbal areas." (*Id.*). Personality-wise, he described Claimant as being stubborn, oppositional, and passive aggressive, pointing out that she had failed marriages, children removed from her home due to abuse charges, and a dysfunctional relationship with her husband. Claimant showed poor judgment and instability throughout her life that Mr. Atkinson felt might be related to diffuse organicity. Claimant had difficulty relating to others, with social phobia avoidance and feelings of being judged. He assessed her with dysthymic disorder, generalized anxiety disorder, borderline intellectual functioning, and personality trait disturbance with histrionic and passive aggressive features. (Tr. at 570). He gave her a Global Assessment of Functioning Score of 50.[2] He felt Claimant's prognosis

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16.  A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment. DSM-IV at 32.

was fair, and she could manage her own financial affairs, including money payments. (*Id.*).

On the same day as his examination, Mr. Atkinson completed a Mental Assessment of Ability to do Work-Related Activities form. (Tr. at 571-73). He determined that Claimant had slight limitations in her ability to maintain personal appearance and be predictable in social situations. (Tr. at 573). She was moderately impaired in her ability to: behave in an emotionally stable manner; complete a normal work day without interruptions from psychologically based symptoms and to perform at a consistent pace; follow work rules; use judgment; interact with supervisors; function independently; maintain attention/concentration; and understand, remember, and carry out simple job instructions. (Tr. at 572-73). He found her markedly limited in her ability to relate to co-workers and deal with the public; deal with work stresses; and understand, remember, and carry out detailed or complex job instructions. (Tr. at 572).[3] Mr. Atkinson did not provide any explanation and did not identify the medical and clinical findings that supported his conclusions.

On November 23, 2010, Catherine Van Verth Sayre, M.A., conducted an adult mental profile of Claimant at the request of the SSA. (Tr. at 574-77). She began by making some general observations and conducting an interview of Claimant. Ms. Van Verth Sayre observed that Claimant's grooming and hygiene were appropriate. Claimant was cooperative and had a good attitude. Although her posture was unremarkable, she appeared unsteady on her feet,. (Tr. at 574). Claimant told Ms. Van Verth Sayre that she had applied for disability due to her history of epilepsy and the side effects of her

---

[3] According to the form used by Mr. Atkinson, slight limitations meant mild limitations, but "the individual can function well;" moderate was defined as "moderately limited" function; marked meant a "serious limitation" in the ability to function. (Tr. at 571).

medications. Claimant stated that she had not worked since 2008 when she began having problems with her knees. Claimant reported having some memory problems and social difficulties. She admitted that when she was upset or angry, she would say hurtful things without thinking. She also indicated that she had sleep disturbance.

Ms. Van Verth Sayre reviewed the records from Claimant's examination by Mr. Atkinson, noting his diagnoses. Claimant denied receiving any mental health treatment. She provided history regarding her seizures and treatment for epilepsy. Claimant also provided her work history, although she had considerable difficulty remembering her dates of employment with the various companies. (Tr. at 575). Claimant also summarized her educational and social history, reporting that she was currently married, but verbally abused her husband.

Ms. Van Verth Sayre performed a mental status examination. She documented that Claimant had difficulty producing spontaneous speech and had blocked stream of thought. However, Claimant was oriented in all four spheres and had a broad affect. Her mood was anxious, her insight was fair, and her judgment was normal. Claimant demonstrated a slow and unsteady gait on clinical observation. Claimant's immediate memory was normal, but her recent and remote memory were moderately impaired. Claimant's concentration was mildly impaired, and her persistence and pace were normal. (Tr. at 576). When asked about her daily activities, Claimant stated that she did the dishes and other household chores; she helped her husband pay the bills; and she visited with her sister, who came over and helped because Claimant tended to "wander off" when she did things alone. (*Id.*).

Ms. Van Verth Sayre assessed Claimant with cognitive disorder, not otherwise specified ("NOS"); provisional dementia due to seizure disorder; provisional personality

change due to seizure disorder; history of dysthymic disorder and generalized anxiety disorder; and borderline intellectual functioning. (Tr. at 576). Ms. Van Verth Sayre explained that some of her diagnoses were provisional, because of a lack of neuropsychological testing and the absence of other sources to interview. She felt that Claimant had a poor prognosis and was not capable of managing her own benefits. (Tr. at 577).

On March 19, 2011, Karl G. Hursey, Ph.D., reviewed Claimant's file and completed a Psychiatric Review Technique pertaining to Claimant. (Tr. at 642-55). He opined that Claimant had an organic mental disorder (borderline intellectual functioning); affective disorder (dysthymic disorder); anxiety-related disorder (generalized anxiety disorder); and a personality disorder (histrionic and passive aggressive features). (Tr. at 642, 643, 645, 647, 649). As to paragraph B criteria, Dr. Hursey felt that Claimant was mildly impaired in activities of daily living, concentration, persistence, or pace; and she was moderately impaired in her ability to maintain social functioning. (Tr. at 652). She had no episodes of decompensation. Claimant also did not meet paragraph C criteria. (Tr. at 653). Dr. Hursey believed that Claimant was generally credible. (Tr. at 654). He noted that she had some problems related to her cognitive functioning and emotional factors, but she did not meet or equal any listed impairment.

Dr. Hursey also completed a Mental Residual Functional Capacity Assessment form. (Tr. at 666-69). He generally found that Claimant was not significantly limited in most mental work-related functions, except she had moderate limitations in her ability to understand and remember detailed instructions; to interact appropriately with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). As far as his RFC assessment, Dr. Hursey opined

that Claimant could engage in gainful activity. He stated that she could complete tasks at a slower pace with regularly scheduled breaks; she could understand routine, repetitive instructions and retain at least one step in her memory; and she could maintain limited contact with supervisors and co-workers. He believed Claimant should have only minimum, brief interaction with the public. (Tr. at 668). Dr. Hursey's Psychiatric Review Technique and Mental RFC assessment were affirmed by Jeff Harlow, Ph.D., who reviewed Claimant's file on June 18, 2011. (Tr. at 679).

## VI.    __Standard of Review__

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the

court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

**VII.   Discussion**

### A. The ALJ's Consideration of the Medical Source Opinion

Claimant contends that the ALJ incorrectly assigned greater weight to the opinions of two non-examining consultants (Dr. Hursey and Dr. Harlow) than to the opinions of two examining consultants (Mr. Atkinson and Ms. Van Verth Sayre). Furthermore, she believes that the ALJ did not adequately explain his rationale for the weight he assigned to the various medical opinions.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be

allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[4] listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In this case, none of the mental health care consultants who supplied opinions to the SSA was a treating provider. Accordingly, none of their opinions was *entitled* to great

---

[4] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

or controlling weight. Instead, the ALJ was required to review the opinions, weigh them, and explain the basis of the weight given to them. In assessing the weight of the opinions, the ALJ should have considered the relevant factors set forth in 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6), but was not obligated to discuss the impact of each factor on the final analysis. *See Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014). ("[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors."). Consequently, the explanation provided by the ALJ did not need to be exhaustive, but should have been sufficient for a subsequent reviewer to understand the weight afforded to the various opinions and the reasons for the weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Young v. Colvin*, No. 3:13-cv-20719, 2014 WL 4546958, at *13 (S.D.W.Va. Sept. 12, 2014) ("Simply stated, the adequacy of the written discussion is measured by its clarity to subsequent reviewers."). Given that none of the medical sources had a treatment relationship with Claimant, and all four of the sources specialized in psychology, the two factors—apart from the opportunity to examine Claimant—most likely to influence the weight given to the opinions were their supportability and their consistency with the evidence.

Having reviewed the written decision, the undersigned **FINDS** that the ALJ fully complied with the pertinent regulations and rulings in weighing the medical source opinions. To begin, the ALJ discussed each of the four opinions and assigned them specific weight. He noted that the non-examining consultants, Dr. Hursey and Dr. Harlow, reviewed Claimant's file and made certain assessments based upon the evidence

in the record. The ALJ gave these opinions great weight, because they were supported by the medical evidence and were consistent with Claimant's self-described activities of daily living and her work duties at Burger King. The ALJ accepted that Claimant had limitations in her ability to remember instructions and needed a job that would allow her to perform at a slower pace, with regular breaks. He also acknowledged that Claimant had deficits in maintaining normal social interactions, and agreed that she would need an employment position that significantly limited her exposure to co-workers, supervisors, and the general public.

With respect to the opinions of the examining consultants, the ALJ considered Ms. Van Verth Sayre's evaluation, but discounted her opinions about the severity of Claimant's mental limitations. The ALJ stated that Claimant's "wide range of activities of daily living including work activity;" her ability to obtain a GED and a certificate in bookkeeping from a vocational school; her hobbies; the social interaction she had at church and when shopping; and her ability to use public transportation were inconsistent with Ms. Van Verth Sayre's extreme limitations. (Tr. at 25). Moreover, the ALJ pointed out that Ms. Van Verth Sayre relied heavily upon Claimant's subjective reports of symptoms, even though the ALJ found that Claimant was not entirely credible. (Tr. at 23). The ALJ stressed that Claimant had never received any medications for psychiatric symptoms and had no history of counseling, therapy, or any formal mental health care treatment. For many of the same reasons, the ALJ discounted Mr. Atkinson's opinions. (Tr. at 25). The ALJ attacked the supportability of some of Mr. Atkinson's findings; for example, the ALJ challenged Mr. Atkinson's conclusion that Claimant had deteriorated mentally and cognitively from her seizures, finding this conclusion to be questionable in light of Claimant's ability to obtain a GED and become certified in bookkeeping and typing

courses. (Tr. at 23). The ALJ further noted the inherent conflict between the severe functional limitations Mr. Atkinson assigned to Claimant, and his opinions that she had a fair prognosis and could manage her own benefits. (*Id.*).

Moreover, the ALJ thoroughly reviewed and considered Claimant's testimony, medical treatment, and activities. (Tr. at 20-23). He noted that Claimant worked regularly for Burger King and had done so for over two years. Her job duties required her to wipe tables and chairs, sweep, and mop. (Tr. at 21). Claimant's work tasks differed each day; therefore, she received a schedule at the beginning of each shift instructing her on what tasks to complete that shift. Regardless, as the ALJ emphasized, there was no evidence that Claimant had trouble completing those tasks. Indeed, Claimant was able to read, understand, and carry out the directions she received at work. (Tr. at 24).

The ALJ also discussed Claimant's activities around her house and in the community. He observed that Claimant lived with her husband, and took care of household chores, paid bills, did the grocery shopping, completed crossword puzzles, and watched television. She also attended church regularly, used public transportation, and visited frequently with her family. (Tr. at 24). She had no apparent problem with attending to her grooming and personal care. The ALJ commented that although Claimant minimized her abilities at times, the evidence undermined her statements. Instead, the record demonstrated that Claimant was capable of managing a household while also working at a local restaurant. With respect to Claimant's medical care, the ALJ indicated that although Claimant had a history of epilepsy, she had not experienced any seizure activity for a number of years. Her treating physician, Dr. Greer, opined that her condition was chronic and well-controlled with medication. In addition, Dr. Yacoub, her neurologist in Delaware, placed only one limitation on Claimant; that being, that she

25

should not be required to climb ladders as part of her job duties.

Consequently, the ALJ fulfilled his mandate with regard to the medical source statements. Obviously, the ALJ believed that the consistency and supportability of the non-examining experts' opinions outweighed any benefit that Mr. Atkinson and Ms. Van Verth Sayre obtained from examining Claimant. Such a determination complies with Social Security regulations, which anticipate that less weight will be accorded to opinions that contradict other substantial evidence, or lack validation in the record. *Craig*, 76 F.3d at 590. The ALJ provided a well-reasoned explanation for the weight he gave both to the opinions of the non-examining consultants and to those of the one-time examiners. Although Claimant disagrees with the ALJ's assessment, his findings were supported by substantial evidence and were reached through a correct application of the Social Security rules and regulations. Accordingly, Claimant's first challenge is unpersuasive.

### B.  Vocational Expert's Opinions

Claimant also contends that the ALJ's reliance on the vocational expert's testimony was erroneous because his testimony was inconsistent with the DOT. (ECF No. 10 at 20). Claimant adds that since two out of the three jobs recommended by the vocational expert required Claimant to remember more than 1 step, the ALJ did not meet his burden of identifying jobs that could be performed by Claimant and that existed in sufficient numbers in the economy.

The vocational expert ("VE") identified three jobs that he felt Claimant could perform when taking into account her RFC, age, education, and background; including, dishwasher, laundry worker, and janitor. (Tr. at 83). The VE indicated that all three jobs had a SVP of 2, which accommodated Claimant's limitations. However, Claimant argues that two of the jobs (laundry worker and janitor) had a SVP of 3. Therefore, the VE's

testimony was flawed.

The number identified by the VE for laundry worker was 361.684-010. (Tr. at 83). When looking at the DOT, it is clear that the SVP associated with that job is 2. Consequently, Claimant's argument is without merit.[5] Claimant is correct that the DOT number identified by the VE for "various janitor jobs," 382.664-010, does have a SVP of 3. However, DOT number 381.687-018, which also refers to various janitorial positions, has a SVP of 2. Therefore, there are janitorial jobs that meet the SVP associated with simple work. *See Fisher v. Barnhart*, 181 F. App'x 359, 367 (4th Cir. 2006) (finding that ALJ's decision was not erroneous when the ALJ adopted the VE's incorrect job, stating "the only reasonable interpretation of the entirety of the vocational expert's testimony is that he misremembered and, consequently, misspoke the job titles and codes in question. The Dictionary entries he meant to mention are not in conflict with his descriptions of them.").

Claimant further maintains that the janitorial and laundry worker positions are inconsistent with her RFC when considering the VE's testimony that those positions require an employee to complete "multiple tasks." Claimant argues that given her RFC, which limits her to routine 1-2 step tasks, she is not capable of working as a janitor or laundry worker. Even if Claimant is correct, eliminating the janitorial and laundry worker positions does not provide a basis for remand. As the Commissioner emphasizes, identification of even one occupation appropriate for Claimant fulfills the Commissioner's burden at the fifth step of the process, so long as the occupation is available in significant numbers in the economy. *See* 20 C.F.R. §§ 404.1566, 416.966 ("[W]ork exists in the

[5] As the Commissioner points out, the ALJ mistakenly listed the DOT number as 316.684-010, which is the designation for butcher. Nonetheless, it is abundantly clear from the VE's testimony and the ALJ's discussion that he intended to reference laundry worker as a job that Claimant could perform, not butcher.

national economy when there is a significant number of jobs (in one or more occupations) having requirements which the [claimant] is able to meet with [her] physical or mental abilities and vocational qualifications."); *see also Young v. Colvin*, No. 13-CV-4551 WFK, 2015 WL 2219000, at *6 (E.D.N.Y. May 11, 2015) ("[E]ven if the VE had identified only one job that existed in sufficient numbers, the Commissioner would have met his burden at the fifth step") (quoting *Sullivan v. Astrue,* 08–CV–6355, 2009 WL 1347035, at *15 n. 15 (W.D.N.Y. May 13, 2009)); *and Bull v. Commissioner of Social Security,* 2009 WL 799966 *6 (N.D.N.Y.) ("Although the vocational expert identified only 'a single job, the Social Security Act affords benefits only to those who cannot 'engage in any other kind of substantial gainful work which exists in the national economy'") (quoting *Renna v. Barnhart,* 2007 WL 602395, at *5 (E.D.N.Y. Feb.21, 2007). Here, the VE testified that the dishwasher job had a SVP of 2 and was "simplistic." He further stated that there were 120,000 dishwasher jobs in the national economy and 5,400 in the tri-state region of West Virginia, Ohio, and Kentucky. (Tr. at 83). As such, the Commissioner satisfied her burden to demonstrate the existence of a significant number of jobs in the national and local economy that Claimant could perform. *Dimaggio v. Colvin*, No. 5:13-CV-296, 2015 WL 4392954, at *15 (D. Vt. July 15, 2015); *Rios v. Colvin*, No. 1:13-CV-1458, 2015 WL 1258908, at *14 (E.D. Va. Mar. 18, 2015) (holding that "[t]he fact that the vocational expert identified only one job is not by itself determinative of this issue. Many circuits including the Fourth Circuit have not clearly established the minimum number of jobs necessary to constitute a 'significant number' and some have found that a minimal number of jobs, including from one occupation, constitute a significant number at step five"); *Farnsworth v. Astrue,* 604 F.Supp.2d 828, 859 (N.D.W.Va. 2009) (explaining that the issue at step five is "whether there is at least one suitable occupation representing a

significant number of jobs in the economy"). Thus, assuming that Claimant is only capable of performing the functions of a dishwasher, there still exists a significant number of jobs available to her. *Id.* at 859 (finding that 1,150 jobs regionally was significant); *Guiton v. Astrue*, No. 1:08CV822, 2012 WL 1267856, at *8 (M.D.N.C. Apr. 16, 2012) (collecting cases that found job numbers ranging from 174 to 1,300 to be significant). Accordingly, the undersigned **FINDS** that the Commissioner met her burden at the fifth step of the sequential process and her decision of non-disability is supported by substantial evidence.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 11), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  December 8, 2015

Cheryl A. Eifert
United States Magistrate Judge